(118 App. Div. 263)

FURBER v. NATIONAL METAL CO.

(Supreme Court, Appellate Division, First Department. March 22, 1907.)

1. CORPORATIONS—TRANSFER OF SHARES—PLEDGES.

Defendant corporation held shares of stock as collateral security for the payment of plaintiff's demand note. While plaintiff was absent from New York in Mexico with the president of defendant, its secretary sent notice to his New York office that the stock would be sold on a certain day. Plaintiff, on hearing of this, asked the president to defer the sale, and he wired the secretary to do so. Later the president, knowing that

plaintiff would remain in Mexico some time, promised to hold the stock for him as long as he could. He at the same time wrote the secretary to sell the stock, and on his return to New York allowed it to be sold. *Held*, that by the conduct of its officers defendant had waived its right to sell the stock, at the time and under the circumstances under which the sale took place, without notice thereof to the plaintiff, and an action would lie for its recovery or for damages in case recovery cannot be had.

2. TENDER—PAYMENT INTO COURT.

Where, in an action against one holding corporate stock as security for plaintiff's demand note, it was shown that defendant voluntarily and wrongfully sold the stock, plaintiff was not bound, after an offer to pay the note and redeem the stock, to keep the tender alive by payment into court.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Tender, § 79-81.]

Appeal from Trial Term, New York County.

Action by Percy N. Furber against the National Metal Company. Judgment for plaintiff, and he appeals. Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and McLAUGHLIN, INGRAHAM, CLARKE, and SCOTT, JJ.

Arthur Furber, for appellant.

De Grove & Riker (Charles Blandy, of counsel), for respondent.

CLARKE, J.   The action was brought to recover the possession of 500 shares of the capital stock of the Oil Fields of Mexico Company and of 10,000 shares of the capital stock of the Vacas San Marcos Mining & Milling Company, deposited by the plaintiff with the defendant as collateral security for the payment of plaintiff's demand promissory note, and in case possession could not be had for damages. At the close of the case, the learned trial court directed a verdict in favor of the plaintiff, upon which a judgment was entered, which "ordered and adjudged that the plaintiff is awarded possession of the 10,000 shares of Vacas San Marcos Mining & Milling Company of the par value of $1 per share, and for the sum of $302.77, together with the sum of $243.20 costs as taxed, making in all the sum of $545.97, and that he have execution therefor." The plaintiff appeals from so much of the judgment as fails to award possession of 500 shares of the Oil Fields of Mexico Company, and in lieu thereof awards the sum of $302.77.

The defendant is a corporation created and existing under the laws of the state of New Jersey. One C. B. Lewis, an old and intimate friend of the plaintiff, was the president of the defendant, and W. B. Lewis, his brother, was its treasurer. The defendant corporation was the owner of about 250,000 shares of the Vacas San Marcos Mining & Milling Company, and C. B. Lewis and plaintiff were two of the three directors of said company. The properties of said mining company were located in Mexico. The defendant held the plaintiff's collateral stock demand note, upon which $1,154.15 was unpaid, and to secure which it held as collateral 500 shares of the capital stock of the Oil Fields of Mexico Company, of the par value of $100 per share, and 10,000 shares of the capital stock of the Vacas San Marcos Mining & Milling Company, of the par value of $1 per share.

This being the relation of the parties, on the 9th day of March, 1904, the plaintiff left New York for the mines in Mexico, having theretofore promised to meet C. B. Lewis and the other director there, a serious emergency having arisen in connection with said property. Up to the time the plaintiff left New York, no notice had been given of any intention to sell his stock, held as hereinbefore set forth, as collateral. The treasurer of the defendant, W. B. Lewis, knew of the plaintiff's departure from New York. He knew that he had started for Mexico to meet his brother, C. B. Lewis, the president of the defendant, on the business of the mining company, of whose stock the defendant held 250,000 shares. With this knowledge he sent a notice to the plaintiff's office in New York that his stock would be sold at auction on March 23d. The plaintiff and C. B. Lewis met in Torreon, Mexico, and reached the mines at 8 o'clock on the night of the 15th of March. On the 17th of March, plaintiff received a telegram, which had been brought in by wagon 18 miles from the nearest telegraph station, from one Westcott, who, shared his New York office, dated March 16th: "National Metal Company advise will sell at auction Vacas and Oil Stock, 23rd." Plaintiff showed Lewis the telegram and asked its meaning. Lewis replied: "Well I cannot help that." Plaintiff stopped the coach, which was about returning, and said: "Very well, if you cannot help it, I am going to leave immediately." Plaintiff testified that, if he had left on that night, he would have reached New York by or before the 23d day of March. Lewis said: "You can't leave, we need you here. It is important that you should remain here for the conference in reference to title," etc. Plaintiff said to Lewis: "I am not going to stay and have my stock sacrificed for the benefit of the Vacas." Lewis said: "What do you want me to do?" Plaintiff replied: "I want you to have that stopped at once." Lewis said: "Well, all right, very well."—and thereupon sent a telegram to W. B. Lewis. The telegram was as follows: "March 17th. Please defer sale Furber stock pending receipt my today's letter."

Plaintiff and Lewis stayed at the mine, and were constantly engaged in the business of the Vacas Company, until the 21st of March, and from there went to Durange and then to Torreon by coach and rail. During the trip on the railroad, Lewis asked Furber: "How long do you want this thing to remain open?" And plaintiff said: "You know I am going down to the Oil Fields, and I cannot possibly be back under six or seven weeks. It may even take me three months." Lewis said: "I know we cannot give you three months." Plaintiff said: "All right, Lewis, if you cannot give me three months, give me just as long as you can. You know the struggle I am having on this deal, and I don't want you to press me quicker than you should for that." Lewis said: "All right."

In another account of the conversation, on cross-examination, plaintiff put it in this way:

"I said I wanted a delay until I could return to the states from Mexico some two months, and he replied in substance that he could not say that so long a delay could be had, and nothing was said fixing the time for the delay of the sale, except that he was to telegraph me. He knew where I was. What

was said on that subject was: I said: 'Very well, Mr. Lewis, if you cannot get me the two months, get me as long as you can.' He said: 'Very well, I will do so.' "

On the 8th day of April, plaintiff, then being at Mexico City, received a letter from the defendant dated April 1st, containing a statement showing that the oil stock had been sold for $1,500, and the Vacas stock had been bought in for $5 on March 30th, and that there was a balance to his credit of $244.17, and that the company held at his disposal said amount and the Vacas stock. He had received no notice that the sale had been postponed to March 30th, and received no notice or communication of any kind from the day that he left Lewis up to the receipt of this letter. He·immediately wrote to the company repudiating the sale, stating: "I shall be prepared upon my return to New York to carry out my side of the agreement, and demand from you the delivery of my collateral." In August he returned to New York, and on the 15th tendered the amount due with interest, and demanded the note and the collateral which was refused.

Two days after Lewis sent the telegram of the 17th of March, he wrote a letter to his brother, the treasurer of the company, which plaintiff never saw, in which C: B. Lewis said, after stating that Furber had shown the telegram:

"He asked me to intervene, and I replied that I could not do so, as the matter was in the hands of our directors, whereupon he replied that in such an event he would be obliged to leave here immediately and go straight to New York. We are up against a situation here which looks somewhat serious. The ore has pinched out at the bottom of the lowest level, and while the outlook is by no means discouraging, it is at least disappointing. We need Mr. Furber's presence here until we have thoroughly analyzed the situation and decided upon our future policy, and it would have been very unfortunate had he left here, as he suggested. Of course, it might have been simply a bluff statement upon his part, but undoubtedly he regards the matter as a very serious one, as presumably the sale of any of the stock we hold as collateral belonging to him at auction would prove a very serious blow to him. Under the circumstances, I could do nothing else than to telegraph you, asking you to defer any action until you received this letter. * * * On Tuesday we shall finish up with the important business we have there, and then Mr. Furber will be free to go back to New York instead of going down to his oil fields, as he purposes. I shall then inform him that I cannot intervene to any further extent, and that he must fix up his remaining obligations to prevent sale of the stock. I do not anticipate that this delay of say a week in your announced intention to sell his collateral will prejudice ourselves any to enable him to get over the somewhat difficult situation here. He informed me some days ago that he intended to be absent at his oil fields about two months, and I shall of course tell him plainly that, if his plans involve a delay of two months upon our part for the sale of his collateral, his absence from New York is entirely out of the question, and that I cannot ask you to delay taking any action looking to the sale of his collateral longer than March 31st."

C. B. Lewis testified:

"I did not give personally to Mr. Furber any writing or verbal statement of the date to which the sale of these securities had been postponed."

Although he had a conversation with him after the letter of the 19th, he said:

"I did not state to Mr. Furber what length of time I was going to have the sale postponed. At the time I had this conversation I knew what the request had been to my brother. I did not tell Mr. Furber what I had written to my brother."

This evidence presents a clear case of unfair dealing: The notice sent to the New York office when the treasurer knew that plaintiff was in Mexico; the president's preventing plaintiff's return to New York in time for the sale because of the necessity for his presence in Mexico; the sending of a telegram, which was shown to plaintiff, directing the sale to be deferred; the writing of a letter two days after fully showing the need of plaintiff's presence in Mexico, and telling the treasurer, his brother, that he could not ask him to delay the sale further than the 31st; not communicating the contents of this letter to plaintiff; using him for his own purposes, and inferentially for the benefit of defendant, until the necessity had ceased; permitting him to go on to attend to his own affairs without a suggestion of the limit put upon the delay; Lewis' return to New York and presence at the sale on the 30th; and permitting it to proceed, when he knew that plaintiff was still in Mexico, without any notice whatever of the sacrifice of his interests. These facts, about which there is no dispute in the evidence, present a simple story of double dealing that ought not to succeed.

In Toplitz v. Bauer, 161 N. Y. 325, 55 N. E. 1059, Judge O'Brien said:

"The contract of bailment, whereby personal property is deposited or pledged as security for a debt, creates duties and relations peculiar to itself. These duties and relations are governed more by the general maxims of equity than by the strict rules of the common law. * * * The pledgee doubtless has the right to exact strict performance of the contract according to its terms, and, upon default in the payment of the debt at the time stipulated, he may, under a contract like this, dispose of the pledge. But if he waives the right to exact strict performance, and gives time and indulgence to the debtor, he cannot recall this waiver at his own option without notice to the pledgor, to the end that the latter may have an opportunity of protecting the pledge. The good faith which the law exacts from a person dealing with trust property will not permit the pledgee, after having once waived the forfeiture or the right to dispose of the pledge upon default of payment at the prescribed time, to suddenly stop short and insist upon the forfeiture for the nonpayment of the debt, when the other party is unprepared to redeem. Strict performance in such cases may be waived by any agreement, declaration, or course of conduct on the part of the pledgee which leads the owner to believe that a forfeiture will not be insisted upon without an opportunity given him to redeem, and no new or independent consideration is required to support a waiver of a condition in a contract requiring payment to be made upon a date designated. * * * In all the elementary books on the law of bailments, which deal at length with that form of the contract known as "pledge," it is stated that, whenever the owner is entitled to notice, and a disposition of the pledge is made without such notice, it amounts to a conversion of the property so pledged, and, doubtless, that is the general rule."

This case was followed by Bailey v. American Deposit & Loan Co., 52 App. Div. 402, 65 N. Y. Supp. 330, unanimously affirmed in 165 N. Y. 672, 59 N. E. 1118, on the opinion of Ingraham, J., who said:

"Here was an indefinite extension of the time to make the payment which, if made, would have been a valid extension of the note for another year. During this indefinite time, however, when such payment was to be made, and a new contract for another year closed, the defendant had waived its right to resort to the forfeiture contained in the original note, and to surrender the policy of insurance without notice. It would not, I think, be claimed that the defendant, the day after writing the letter, would have been justified in surrendering the policy and enforcing the forfeiture without notice to the obligors. If not on the next day, on just what day would the right of the defendant to

enforce this forfeiture accrue? * * * If defendant had waived its right to thus forfeit the pledge without notice, such a forfeiture was a conversion of the policy for which the defendant would be liable."

In Hastings v. Brooklyn Life Insurance Co., 138 N. Y. 473, 34 N. E. 289, the Court of Appeals said the president or other general officer of the corporation has power prima facie to do any act which the board of directors could authorize or ratify. In the case at bar it seems to me that, irrespective of the act of the president, his talks with the plaintiff in Mexico and his telegram there shown, the act of the company itself in postponing the sale was the granting of an indulgence by it, and, inasmuch as it had given notice of the sale on the 23d, to make a sale on any other day valid, notice of that postponed sale must have been given. Every instinct of equity and fair dealing condemns the transaction as outlined in this record.

In Case v. Higenibotam, 100 N. Y. 248, 3 N. E. 189, Judge Miller said:

"The evidence upon the trial established the fact that the diamonds held by the plaintiff were pledged to him by the defendant, as security for the payment of the promissory note in suit. The plaintiff therefore was a bailee of the same, and only had the right to retain them until his debt was paid. Upon payment being made, he was bound to return the goods, and, upon refusal to do so, became liable to the bailor in replevin or in an action of trover or assumpsit. * * * The tender here made was after the suit was brought, and included the principal and interest of the debt and the costs of the action as far as it had proceeded. Being a conditional tender, and depending upon the return of the property, which was demanded, there would seem to be no obligations on the part of the defendant to pay the money into court. * * * It follows that it was not necessary to bring the money into court to make the tender valid, and, if the defendant had title to the property, the lien of the plaintiff on the same was discharged, and he became liable to the defendant for the goods or the value thereof. * * * Unless the refusal to return the property was justified, there was clearly a conversion of the same by the plaintiff, and the defendant had a right of action for the recovery of the value thereof or of the property itself."

In Barnett v. Selling, 70 N. Y. 492, it was said:

"Replevin, as a substitute for an action of detinue, now obsolete, will lie, although the defendant has parted with the possession of the property, and the same is beyond the reach of the processes of the court, so that in no event can a return of the property be had either in virtue of the 'claim and demand' of the plaintiff or any judgment that may be given in the action. Nichols v. Michael, 23 N. Y. 264, 80 Am. Dec. 259."

In Sinnott v. Feiock, 165 N. Y. 444, 59 N. E. 265, 53 L. R. A. 565, 80 Am. St. Rep. 736, Judge Cullen, reviewing the cases, including Nichols v. Michaels and Barnett v. Selling, supra, states that the doctrine has been steadily adhered to by the Court of Appeals that, where a person is in possession of goods belonging to another, which he is bound to deliver upon demand, if he, without authority from the owner, parts with that possession to one who refuses to deliver them, he is responsible in detinue, and that the action of replevin will lie where the defendant has voluntarily parted with the property.

Upon the facts presented upon this record, the defendant waived its right to sell the stock deposited as collateral at the time and under the circumstances under which the sale took place, without notice there-

of to the plaintiff. Under the cases cited, the action lies. The defendant having voluntarily and wrongfully parted with the possession of the stock, there was no necessity for keeping the tender alive by a payment into court of the money due on the original note. Therefore the court erred in the direction of the verdict.

It follows that the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.